THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
BROWARD DIVISION

Susan Kay Smart,                                )
                                                )        **JURY TRIAL**
                                                )        **DEMANDED**
            Plaintiff,                          )
                                                )
v.                                              )        Case No.
                                                )        00 - 6140
HUMANA INC.,                                    )
                                                )        CIV-UNGARO-BENAGES
            Defendant.                          )
                                                )        MAGISTRATE JUDGE
_____)        BROWN

## CLASS ACTION COMPLAINT

1.      Susan Kay Smart, ("Plaintiff"), by and through her undersigned attorneys, brings this

action individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil

Procedure.  Plaintiff seeks treble damages under the Racketeer-Influenced and Corrupt

Organizations Act (RICO), 18 U.S.C. §§1961-1968, on behalf of herself and a class consisting of

all persons in the United States who are, or were, enrolled in Humana Inc.'s health maintenance

organizations ("HMOs") preferred provider organizations ("PPOs") and/or point of service plans

("POSs"), operated by Defendant Humana, Inc. at any time during the period from October 4,

1995 through and after the date hereof until Humana's continuing illegal and wrongful conduct

has ceased  (the "Class Period").   On behalf of herself and all members of a Sub-Class

consisting of all Humana Subscribers during the period from October 4, 1993 through and after

the date hereof until Humana's continuing illegal and wrongful conduct has ceased (the "Sub-

1



Class Period"), Plaintiff Susan Kay Smart also seeks equitable and other relief under the Employee Retirement and Income Security Act (ERISA), 29 U.S.C.§§ 1001-1169.

2.      The Class consists of millions of present and former Humana subscribers ("Subscribers"), not including persons insured by Medicare or Medicaid ("the Class"). The Subclass consists of those policyholders who purchased their Humana coverage through their employers' ERISA-governed health benefits plans ("Benefit Plans"). Plaintiff alleges the following upon information and belief, except as to paragraph 16, pertaining to Plaintiff's own actions, which are alleged upon personal knowledge.

## I.  INTRODUCTION

3.      This case arises from Defendant Humana's systematic and intentional  concealment from members in its health plans of accurate information about when health care will be provided, when claims will be approved or disapproved, and what criteria and procedures are actually used to determine the extent and type of coverage.

4.      At issue in this action is whether Humana is liable under existing federal law for, among other things, repeated and continuing fraudulent conduct involving material misrepresentations and misleading omissions in disclosures to Humana Subscribers. This action does not challenge the legitimacy or wisdom of "managed care" as a means of delivering health services in the United States.

5.      Humana consistently told subscribers to its plans that coverage and treatment decisions under Humana policies will be made on the basis of "medical necessity."   Contrary to these representations, however, Humana did not provide coverage or review claims solely, or

2

sometimes at all, on the basis of medical necessity, as described to Subscribers. Instead, as detailed below, Humana treatment and coverage determinations took account of a variety of concealed cost-based criteria that were unconcerned with, and sometimes inimical to, the medical needs of Class Members ("Undisclosed Cost-Based Criteria").

6.     Humana also concealed from Class Members that it has established a set of financial incentives for claims reviewers – including direct cash bonus payments – designed to encourage denial of claims without regard to medical needs of patients. ("Undisclosed Claim Denial Incentives"). Indeed, *Humana's incentives encouraged claims reviewers to deny claims or limit hospital admissions even where such claims or admissions satisfied the medical necessity criteria set forth in Humana's Health Plan documents.*

7.     Humana also concealed from Class Members that, in certain circumstances, Humana subcontracts the claims review process – and with it, the authority to decide the scope of Subscribers' medical coverage – to third parties. These third parties have based claim approval decisions, in whole or in part, on undisclosed criteria, with the purpose and effect of limiting the circumstances when Humana would approve treatment or claims.

8.     In addition, Humana concealed from Class Members that both Humana and third parties with whom Humana subcontracted allowed persons without appropriate medical training and specialization to make claims review determinations.   Humana thus failed to inform the Class that decisions respecting medical necessity would be made by persons without the appropriate medical experience or training to recognize medical necessity.

3

9.     Humana also concealed from Class Members that Humana provides direct financial incentives to treating physicians and other health care professionals to deny coverage to individuals enrolled in Humana's Health Plans, even where the proposed treatment satisfies the Humana Medical Necessity Definition set forth in Humana's Disclosure Documents. Among other things, Humana enters into risk-sharing arrangements with physicians, including without limitation so-called "capitated payment" arrangements, that provide financial incentives to treating physicians for not prescribing or recommending treatment for Class Members.

10.     By means of the affirmative misrepresentations and omissions described more fully below, Humana intended to and did provide Plaintiff and the class with health insurance benefits of lesser value than promised.  Humana unjustly enriched itself at the Class's expense by millions and millions of dollars.

11.     As set forth in detail below, Humana's conduct constituted a pattern of racketeering activity as defined in the Racketeer-Influenced and Corrupt Organizations Act (RICO), and is actionable under RICO.  Plaintiff and the Class thus seek treble damages for the injuries they have sustained as a direct and proximate result of Defendant Humana's unlawful conduct.

12.     As also set forth below, Defendant Humana has violated the disclosure provisions of ERISA and has breached the fiduciary duties it owes to the Sub-Class of Subscribers to Humana's ERISA benefit plans.  Pursuant to ERISA, Plaintiff Susan Kay Smart and the Sub-Class thus seek both (a) recovery of benefits according to the terms of her plans and (b) equitable relief, including corrective disclosures, as provided in the ERISA statute.

4

## II. JURISDICTION AND VENUE

13.    This action is brought to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees, for the injuries sustained by Plaintiff and Class Members resulting from violations by the Defendant, as hereinafter alleged, of RICO, 18 U.S.C. §§ 1964(c) and 1962(c). This Court has subject matter jurisdiction over the claims of Plaintiff and the Class pursuant to 18 U.S.C. § 1964 and 28 U.S.C.§ 1331.

14.    This action is also brought under § 502 of ERISA, 29 U.S.C. § 1132 for injunctive and other equitable relief. This Court has subject matter jurisdiction over the claims of the Plaintiff and the Subclass pursuant to § 502(e)(1) of ERISA, 29 USC §1132(e)(1).

15.    The activities alleged in this Complaint were carried out, in part, within this District, and the Defendant carries out within this District, in part, the interstate trade and commerce hereinafter described. Venue is appropriate.

## III. PLAINTIFF

16.    Plaintiff Susan Kay Smart is a resident of Broward County, Florida. At all times relevant hereto, Susan Kay Smart was a member of a Humana Health Plan arranged through her employer, Broward County School Board.

          a)    Susan Kay Smart became employed by Broward County School Board on or about August 1993 as a teacher, and in other instructional positions. Susan Kay Smart was offered health insurance coverage, in addition to her salary, as compensation for her services.

          b)    During the relevant period, Broward County School Board offered Ms. Smart a choice between two different Humana plans, an HMO and a PPO, in addition to other

5

health insurance choices.  Upon reliance of what Ms. Smart believed Humana offered, she chose the Humana PPO.  During her employment by Broward County School Board, Ms. Smart has paid for her Humana coverage with the value of her services, in addition to income withdrawals for coverage for her family.

        c)      In or about 1993, when Susan Kay Smart became a participant in the Humana plan, she was supplied a description of the benefits by Humana, which represented, among other things, that coverage under her Humana Health Plan would be provided when her medical claims satisfied the Medical Necessity Definition set forth in her Humana policy and other Disclosure Documents.   The description of benefits concealed from Susan Kay Smart that Humana actually used additional, more restrictive standards to determine when coverage would be approved and provided.  For example, and without limitation, Humana used Undisclosed Cost-Based Criteria to make coverage and treatment decisions; created Undisclosed Claim Denial Incentives to influence claims review decisions; contracting with third parties to perform claims review; and allowed persons without appropriate training to make claims review decisions.  Since the time of her enrollment in Humana, Ms. Smart has not received notice from Humana that her coverage has changed.  On the basis of the information provided by Humana about her benefit coverage, Ms. Smart continued and paid for her enrollment in Humana in the subsequent year.

        d)      After being informed of these Humana utilization management standards and  procedures described in the preceding paragraph, Susan Kay Smart realized that the

6

coverage she actually had purchased from Humana is not as valuable to her as the coverage Humana represented to her.

## IV. DEFENDANT

17.    Defendant, Humana Inc. is a Delaware corporation with corporate headquarters are in Louisville, Kentucky.   Humana is traded on the New York Stock Exchange.

18.    The overwhelming majority of Humana's Membership is located in 15 states: Alabama, Arizona, Arkansas, Florida, Georgia, Illinois, Indiana, Kentucky, Mississippi, Ohio, South Carolina, Tennessee, Texas, Wisconsin and Wyoming.  Humana offers health plans and other employee benefit products in at least 38 states, including (in addition to the 15 states listed above), Alaska, California, Nevada, Idaho, North Dakota, South Dakota, Colorado, Nebraska, Missouri, Oklahoma, Louisiana, Iowa, New Jersey, Utah, Maryland, Virginia, West Virginia, North Carolina, Michigan, New Mexico, Hawaii, and Kansas.

19.    Since 1983, Humana, through a network of providers, has offered health care services to approximately 6.2 million Members/subscribers annually. The Company operates health maintenance organizations (HMOs), preferred provider organizations (PPOs) and point of services plans (POSs) that encourage or require the use of providers who have contracted with Humana.  Humana contracts with more than 9,200 primary care physicians and specialists and 73 hospitals to provide health care through its HMOs and PPOs.

20.    Humana Inc. is the parent corporation of the following subsidiaries that provide health care services, including without limitation:

    (1)    Humana Health Plans of Alabama, Inc.;

7

(2)    QuestCare, Inc.;

(3)    Centerstone Insurance and Financial Services Inc. and West Coast Multiple Servs, Inc.

(4)    Centerstone Holding Corporation;

(5)    EMPHESYS Financial Group, Inc.;

(6)    Health Value Management, Inc.;

(7)    Humana HealthChicago, Inc.;

(8)    Humana Inc. d/b/a H.A.C. Inc. and Humana of Delaware, Inc.;

(9)    Humana Military Healthcare Services, Inc., d/b/a Humana Military Health Services, Inc.;

(10)    Medstep, Inc.;

(11)    Physician Corporation of America;

(12)    Delray Beach Health Management Associates, Inc., d/b/a Humana Health Care Plans - Delray;

(13)    Family Health Plan Administrators, Inc.;

(14)    Health Inclusive Plan of Florida, Inc., d/b/a Humana Health Care Plans - Century Village Palm Beach;

(15)    Humana Health Care Plans - Davie, Inc., f/k/a Coastal Physician Group of South Davie, Inc.;

(16)    Humana Health Care Plans - Palm Springs, Inc. f/k/a Coastal Managed Care of Lake Worth, Inc.;

8

(17)    Humana Health Care Plans - Rolling Hills, Inc., f/k/a Coastal Physician Group of North Davie, Inc.;

(18)    Humana Health Care Plans - South Pembroke Pines, Inc. f/k/a Coastal Physician Group of Pembroke Pines, Inc.;

(19)    Humana Health Care Plans - West Palm Beach, Inc. f/k/a Coastal Managed Care of West Palm Beach, Inc.;

(20)    Humana Internal Medicine Associates, Inc. f/k/a Coastal Internal Medicine Associates of Dade, Inc., d/b/a: (1) Humana Health Care Plans - Hialeah f/k/a Coastal Internal Medicine Associates of Hialeah; (2) Humana Health Care Plans - South Miami f/k/a Coastal Internal Medicine Associates of Larkin; (3) Humana Health Care Plans- Miami, f/k/a Coastal Internal Medicine Associates of Miami; (4) Humana Health Care Plans - Miami Beach f/k/a Coastal Internal Medicine Associates of Miami Beach, (5) Humana Health Care Plans- Royal Oaks f/k/a Coastal Internal Medicine Associates of Miami Lakes; (6) Humana Health Care Plans - Miami Springs f/k/a Coastal Internal Medicine Associates of Miami Springs; (7) Humana Health Care Plans - Midway f/k/a Coastal Internal Medicine Associates of Midway; (8) Humana Health Care Plans - Boca Raton; (9) Humana Health Care Plans -Delray Harbor; (10) Humana Health Care Plans - Lantana; (11) Humana Health Care Plans - Palm

Beach Gardens; (12) Humana Health Care Plans - Tamarac; and (13) Humana Health Care Plans - West Boca.

(21)    Humana Internal Medicine Associates of the Palm Beaches, Inc. f/k/a Coastal Internal Medicine Associates of the Palm Beaches, Inc., d/b/a: (1) Humana Health Care Plans - Lake Worth f/k/a Coastal Internal Medicine Associates of JFK Circle; (2) Humana Health Care Plans - Flagler f/k/a Coastal Internal Medicine Associates of Northern Dixie Highway; (3) Humana Health Care Plans - Riverbridge f/k/a Coastal Internal Medicine Associates at Riverbridge; (4) Humana Health Care Plans - Palm Beach f/k/a Coastal Internal Medicine Associates of South Dixie Highway; (5) Humana Health Care Plans - Boynton Beach;

(22)    Humana Health Insurance Company of Florida, Inc.;

(23)    Humana Medical Plan, Inc., d/b/a: (1) Coastal Pediatrics -Daytona; (2) Coastal Pediatrics - Port Orange; (3) Coastal Pediatric - Ormond; (4) Daytona Gastroenterology; (5) Flagler Family Practice; (6) Florida Dermatology Center; (7) Humana Medical Plan - West Palm Beach; (8) Internal medicine of Daytona; (9) Orange Park Family Health Care; (10) St. Augustine Family Health Center; and (11) Suncoast Medical Associates;

(24)    Lakeside Medical Center Management, Inc., d/b/a University Medical Center;

10

(25)    PCA Options, Inc.;

(26)    Humana Employers Health Plan of Georgia, Inc., f/k/a

EMPHASES Healthcare of Georgia, Inc.;

(27)    Humana Health Direct, Inc., d/b/a Behavioral Health Direct;

(28)    Humana HealthChicago Insurance Company, d/b/a Goldcare 65;

(29)    HMPK, Inc.;

(30)    HPLAN, Inc.;

(31)    Humana Health Plan, Inc.: d/b/a (1) Central Kentucky Family

Practice; (2) Franklin Medical Center; (3) Humana Health Care Plans of

Indiana; (4) Madison Family and Industrial Medicine (KY); and (5)

Humana Health Care Plans -Somerset (KY);

(32)    Humana Kansas City, Inc., d/b/a: (1) Humana Prime Health Plan;

(33)    Humana Health Insurance of Nevada, Inc.;

(34)    Humana Health Plan of Ohio, Inc., f/k/a ChoiceCare Health Plans,

Inc., d/b/a ChoiceCare/Humana (IL, IN, KY, OH);

(35)    Humana Insurance of Puerto Rico, Inc.;

(36)    Humana HMO Texas, Inc.;

(37)    Humana Health Plan of Texas, Inc., d/b/a: (1) Humana Health Plan

of San Antonio; (2) Humana Regional Service Center; (3) Leon Valley

Health Center; (4) Lincoln Heights Medical Center; (5) MedCentre Plaza

Health Center; (6) Perrin Oaks Health Center; (7) Val Verde Health

11

Center; (8) West Lakes Health Center; and (9) Wurzbach Family Medical

Center;

    (38)    PCA Health Plans of Texas, Inc.;

    (39)    PCA Provider Organization, Inc;

    (40)    CareNetwork, Inc., d/b/a CARENETWORK;

    (41)    Humana Wisconsin Health Organization Insurance Corporation

d/b/a: (1) WHOIC; and (2) WHO;

    (42)    Independent Care, Inc.;

    (43)    Network EPO, Inc.; and

    (44)    Wisconsin Employers Group, Inc.

21.     Unless otherwise specified, Humana Inc. and the Humana Health Plans as well as

Humana-owned,-operated or -controlled entities that offer health insurance are collectively

referred to herein as "Humana."

### V. DEFINITIONS

22.     As used herein, the following terms are defined as:

    (A)    "Health Plan" means a plan that provides medical services to employment groups, other affinity groups and individuals.

    (B)    "Benefit Plan" means an ERISA-governed employee welfare plan offered by an employer as an employment benefit and provided in exchange for the employee's labor and services.

    (C)    "Humana Medical Necessity Definition" means the factors set forth by Humana in Health Policies, summary plan descriptions, certificates of coverage, other plan descriptions, notifications of modifications and changes to the plan, and other documents sent to

Class Members to describe the circumstances under which Humana will provide health insurance coverage.

According to the Humana Medical Necessity Definition, services and supplies are medically necessary when they are:

1.    consistent with the symptom or diagnosis and treatment of the member's injury or sickness;

2.    appropriate with regard to standards of good medical practice;

3.    not solely for the convenience of a member, physician, hospital or ambulance care facility; and

4.    the most appropriate supply or level of service which can be safely provided to the member. When applied to the care of an inpatient, it further means that the Members medical symptoms or condition require that the services cannot be safely provided to the member on an outpatient basis.

(D)    "Health Policy" means a contract for the provision of health insurance between an insured and Humana Inc. and/or a Humana Plan.

(E)    "Utilization Policies and Procedures" means those policies and procedures set forth in the <u>Utilization Management Policies and Procedures Manuals</u> approved by Defendant.

(F)    "Undisclosed Cost-Based Criteria" means criteria based in whole or in part on cost considerations, used by Humana to determine the medical necessity of treatment for coverage purposes, including but not limited to (i) Interqual Criteria, (ii) Milliman and Robertson Criteria, and (iii) Value Health Sciences, Inc. criteria and guidelines.

(G)    "Disclosure Documents" are documents Humana has delivered or caused to be delivered to Class Members by means of the United States Postal Service concerning the amount, quality and circumstances of care and service offered by Humana Health Plans. These documents include, without limitation, (i) summary

13

plan descriptions; (ii) certificates of coverage; (iii) other plan descriptions mailed to Class Members upon or after her enrollment in a Humana Health Plan; (iv) notifications of Health Plan changes or modifications; (v) penta-annual updated summary plan descriptions.

(H)    Subscribers means person who have purchase membership (enrolled in) a Humana Health Plan individually or as arranged by an employer or other affinity group, together with her spouses, dependents and beneficiaries.

(I)    Class Members means persons who purchased memberships (enrolled in) Humana Health Plans individually or as members of employment groups (the Class. The Class includes a subclass of persons whose employment group health benefit plans are governed by ERISA as well as RICO (the Subclass). Unless otherwise indicated, where ever the term "Class" is used, it includes the "Subclass" and where ever the term "Subclass" is used, it means only the Subclass.

## VI. CLASS ACTION ALLEGATIONS

23.    Plaintiff Susan Kay Smart, brings this action on behalf of herself and, under Fed. R. Civ. P. 23(b)(2) and 23(b)(3), as representatives of a class (the "Class" or "Plaintiff Class") defined as all persons who during the Class Period were Humana policy holders. The Class does not include Defendant's directors, officers and employees. In addition, this action does not seek to remedy claims of personal injury, medical malpractice and/or wrongful death against Defendant.

24.    Plaintiff Susan Kay Smart brings this action on behalf of herself and pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3), as representative of a Sub-Class defined as all persons who are or have been the participants and/or beneficiaries of an employee welfare plan as defined in 29 U.S.C. § 1002(1) which was underwritten and/or administered by Humana between since October 4, 1993 .

14

25.    Members of the Class are numerous and joinder is impracticable.  Plaintiff believes that there are millions of Class Members as above-described.  Their exact number and identities is known by the Defendant.

26.    Plaintiff's claims are typical of the Members of the Class.  Plaintiff and Members of the Plaintiff Class were damaged in the same way  by the same wrongful conduct of Defendant.

27.    Plaintiff will fairly and adequately protect and represent the interests of the Plaintiff Class and Sub-Class.  The interests of Plaintiff are coincidental with and not antagonistic to those of the Class and Sub-Class.

28.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex class action litigation.

29.    Questions of law and fact are common to the Class.  These questions include, but are not limited to:

a.    Whether Defendant engaged in a pattern of wrongful conduct, by a scheme of material misrepresentations and omissions in documents provided directly and indirectly to Class Members, to fraudulently induce Plaintiff and Class Members to enroll or remain enrolled in Humana Health Plans;

b.    Whether Defendant knowingly misrepresented to the Class Members, or knowingly permitted misrepresentations to be made on its behalf to the Class Members, that claims for coverage of medical services specified in Humana's Health Policies would be paid if the services met the Humana Medically Necessity Definition;

15

c.      Whether Humana used criteria for coverage that were based on Undisclosed Cost-Based Criteria that are different from or more restrictive than the factors included in the  Humana Medical Necessity Definition;

d.      Whether Humana concealed from Class Members that it has established a set of Undisclosed Claim Denial Incentives that encourage claims reviewers to deny claims without regard to the medical needs of patients;

e.      Whether Humana fraudulently omitted to disclose to the Class that in certain circumstances, Humana subcontracts the claims review process – and with it, the authority to decide the scope of Subscribers' medical coverage – to third parties, which have based claim approval decisions, in whole or in part, on undisclosed criteria, with the purpose and effect of limiting the circumstances when Humana would approve treatment or claims financial incentives to physicians;

f.      Whether Humana concealed from Class Members that both Humana and third parties with whom Humana subcontracted allowed persons without appropriate medical training and specialization to make claims review determinations; .

g.      Whether Humana conducted the affairs of an enterprise through a pattern of racketeering activity as defined in RICO.

h.      Whether Humana participated in the operation and management of both national health care network and state and local health care networks, consisting of Humana, the Health Plans, primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies, and home health agencies.

16

i.    Whether the property and business of the Plaintiff Class was directly and proximately injured within the meaning of § 1964 of RICO, as a result of Humana's racketeering activities and predicate acts consisting of a wrongful scheme intended to defraud the Plaintiff Class, and involving use of the United States mail and interstate wire services in furtherance of that scheme to disseminate to the Class advertising materials, Health Policies, benefit descriptions, claims forms, and letters misrepresenting and omitting to disclose the coverage provided by Humana policies in violation of RICO;

j.    Whether Humana participated in the operation and management of both national health care network and state and local health care networks, consisting of Humana, the Health Plans, primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies, and home health agencies.

k.    Whether Humana engaged in an open-ended pattern of racketeering activity involving multiple acts of mail fraud, wire fraud and other unlawful means, with the purpose and goal of fraudulently inducing the maximum number of persons to subscribe to Humana Health Plans for the benefit of Humana.

l.    Whether by sending though the mails a series of documents containing material omissions and misrepresentations with respect to  eligibility for payment of claims fraudulent statements and omissions to subscribe to health care policies offered by Humana, Humana purposely induced Class Members to pay for health policies  that were worth less than the value of the policies described by Humana.

17

      m.    Whether Humana intentionally, recklessly or negligently damaged and irreparably harmed Plaintiff and Class Members by the conduct described herein;

      n.    Whether Humana's failure to operate its Benefit Plans in accordance with the representations contained in the Disclosure Documents violated § 404 of ERISA;

      o.    Whether Humana, by its use of use of restrictive Undisclosed Cost-Based Criteria violated conduct, violated its duty to inform Sub-class members of any reduction in coverage as provided by § 104(b) of ERISA;

      p.    Whether Humana retained the benefits of the above alleged practices which otherwise would have belonged to Class Members; and

      q.    Whether the market value of the Humana Policies as represented was more than the market value of the policies as implemented.

30.    The above-identified common questions predominate over questions, if any, that may affect only individual Class Members.

31.    The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

32.    Defendant has acted on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

33.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that such treatment will permit a large number of similarly situated persons to

prosecute her common claims in a single forum simultaneously, efficiently, and without the necessary duplication of evidence, effort, and expense that numerous individual actions would require.

## VII. FACTUAL BACKGROUND COMMON TO ALL CLAIMS

### A. Humana's National Health Care Network

34.    At all relevant times, there existed a national health care network, assembled by defendant Humana and consisting of Humana, the Humana Health Plans, primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies and home health agencies, all associated as part of the health care network for the common purposes of providing medical services to Humana subscribers and earning profits from the provision of those services.  (This national network is hereinafter referred to as the "National Enterprise").

(1)1    The National Enterprise is composed of:

(1)1    Humana and subsidiaries set forth in paragraph 20  above

(1)2    the primary doctors in private practice, who are not employees of Humana or its subsidiaries, but who contract with Humana or its subsidiaries to provide primary care to Class Members through Humana's Health Plans;

(1)3    medical specialists who are not employees of Humana or its subsidiaries, but who contract with Humana or its subsidiaries to provide care to Class Members;

19

(1)4    medical laboratories that are not owned by Humana or its subsidiaries but that contract with Humana or its subsidiaries to provide diagnosis and other laboratory services for Humana and to Class Members;

(1)5    hospitals that are not owned by Humana or its subsidiaries but that contract with Humana to provide hospital facilities and services for Humana and to Class Members;

(1)6    outpatient centers that are not owned by Humana or its subsidiaries but that contract with Humana to provide outpatient services for Humana and to Class Members;

(1)7    pharmacies that are not owned by Humana or its subsidiaries but that contract with Humana to provide pharmacy services for Humana and to Class Members; and

(1)8    home health centers that are not owned by Humana or its subsidiaries but that contract with Humana to provide home health services for Humana and to Class Members.

35.    The National Enterprise is centrally operated from Humana's national headquarters in Louisville, Kentucky.  The National Enterprise includes the following structural and operational features:

(1)1    "Nationally, Humana has assembled one of health care's largest networks." (Humana Web Site).

(1)2    "Centralized management services are provided to each health plan from the Company's headquarters and service centers. These services include management information systems, product administration, financing, personnel, development, accounting, legal advice, public relations, marketing, insurance, purchasing, risk management, actuarial, underwriting and claims processing." (Humana 1998 10-K at 14).

(1)3    "Humana operates one of the largest managed care data centers in the nation. The primary computing facility is located in Louisville, Kentucky. Humana's application systems are largely developed and maintained in-house by a staff of 400 application programmers who are versed in the use of state-of-the-art technology. . . The information systems support marketing, sales, underwriting, contract administration, billing, financial, and other administrative functions as well as customer service, authorization and referral management, concurrent review, physician capitation and claims administration, provider management, quality management and utilization review." (Humana Web Site.)

(1)4    "Humana's Information Systems organization operates in a centralized manner. Humana's data center and the majority of its programming and support staff are located at its corporate offices in Louisville, Kentucky." (Humana Web Site.)

(1)5    "The Company [defendant Humana] is a health services company that facilitates the delivery of health care services through networks of providers to its approximately 6.1 million medical members. The Company's products are marketed primarily through health maintenance organizations ("HMOs") and preferred provider organizations ("PPO's") that encourage or require the use of contracted providers." (Humana 1999 10-Q (which quarter?), at 11-12).

(1)6    The administration of Humana's utilization management program is shared among a centralized staff located in Louisville and staff located in each market.

(1)7    The Corporate Medical Affairs Department in Louisville forwards several reports to the local markets on a monthly basis to enable them to track the performance of individual physicians.

(1)8    Pre-admission review is a centralized operation based in Louisville, including pre-admission certification for PPO's and pre-admission notification for HMO's.

36.    The administration of Humana's utilization management program is shared among a centralized staff located in Louisville and staff located in each market.

### B. The State and Local Health Care Networks

37.    At all relevant times, in each state where Humana Health Plans operate, there existed one or more state and/or local health care networks, assembled by Humana and consisting of

22

Humana, the state and/or local Humana Health Plan(s), primary doctors, medical specialists,

medical laboratories, hospitals, outpatient centers, pharmacies and home health agencies. (These

state and local health networks are hereinafter referred to as the "State and Local Enterprises".)

(1)    Each of the Humana State and Local Enterprises is composed of:

(1)1    Humana and one or more of the Humana subsidiaries set forth in

paragraph 20 above;

(1)2    the primary doctors in private practice, who are not employees of Humana

or its subsidiaries, but who contract with Humana or its subsidiaries to

provide primary care to Class Members through the Humana Health Plan

or Plans that are administered through the State or Local Enterprise;

(1)3    medical specialists who are not employees of Humana or its subsidiaries,

but who contract with Humana or its subsidiaries to provide care to Class

Members through the Humana Health Plan or Plans that are administered

through the State or Local Enterprise;

(1)4    medical laboratories that are not owned by Humana or its subsidiaries but

that contract with Humana or its subsidiaries to provide diagnosis and

other laboratory services for Humana and to Class Members through the

Humana Health Plan or Plans that are administered through the State or

Local Enterprise;

(1)5    hospitals that are not owned by Humana or its subsidiaries but that

contract with Humana to provide hospital facilities and services for

23

Humana and to Class Members through the Humana Health Plan or Plans
that are administered through the State or Local Enterprise;

(1)6    outpatient centers that are not owned by Humana or its subsidiaries but
that contract with Humana to provide outpatient services for Humana and
to Class Members through the Humana Health Plan or Plans that are
administered through the State or Local Enterprise;

(1)7    pharmacies that are not owned by Humana or its subsidiaries but that
contract with Humana to provide pharmacy services for Humana and to
Class Members through the Humana Health Plan or Plans that are
administered through the State or Local Enterprise; and

(1)8    home health centers that are not owned by Humana or its subsidiaries but
that contract with Humana to provide home health services for Humana
and to Class Members through the Humana Health Plan or Plans that are
administered through the State or Local Enterprise.

38.    Each  State and Local Enterprise is an association in fact operating for the common
purposes of (1) providing medical services to Humana subscribers and (2) earning profits from
the providing of those services.  Each State and Local Enterprise is centrally operated from
Humana's national headquarters in Louisville, Kentucky.  The features of the structure and
operation of the State and Local Enterprises include the following:

(1)1    "Nationally, Humana has assembled one of health care's largest networks.
Locally, where care is delivered, our networks are as deep as they are

broad, with primary doctors, specialists, lab services, hospitals, outpatient centers, pharmacies and home health agencies." (Humana Web Site).

(1)2    "Centralized management services are provided to each health plan from the Company's headquarters and service centers. These services include management information systems, product administration, financing, personnel, development, accounting, legal advice, public relations, marketing, insurance, purchasing, risk management, actuarial, underwriting and claims processing." (Humana 1998 10-K at 14).

(1)3    "Humana operates one of the largest managed care data centers in the nation. The primary computing facility is located in Louisville, Kentucky. Humana's application systems are largely developed and maintained in-house by a staff of 400 application programmers who are versed in the use of state-of-the-art technology. . . The information systems support marketing, sales, underwriting, contract administration, billing, financial, and other administrative functions as well as customer service, authorization and referral management, concurrent review, physician capitation and claims administration, provider management, quality management and utilization review." (Humana Web Site.)

(1)4    "Humana's Information Systems organization operates in a centralized manner. Humana's data center and the majority of its programming and

25

support staff are located at its corporate offices in Louisville, Kentucky." (Humana Web Site.)

(1)5   "The Company [defendant Humana] is a health services company that facilitates the delivery of health care services through networks of providers to its approximately 6.1 million medical Members. The Company's products are marketed primarily through health maintenance organizations ("HMOs") and preferred provider organizations ("PPO's") that encourage or require the use of contracted providers." (Humana 1999 10-Q (First Quarter), at 11-12).

(1)6   The administration of Humana's utilization management program is shared among a centralized staff located in Louisville and staff located in each market.

(1)7   The Corporate Medical Affairs Department in Louisville forwards several reports to the local markets on a monthly basis to enable them to track the performance of individual physicians.

(1)8   "The Company's subsidiaries operate in states which require certain levels of equity and regulate the payment of dividends to the parent company." (Humana 1999 10-Q (First Quarter) at 15.)

(1)9   Pre-admission review is a centralized operation based in Louisville, including pre-admission certification for PPO's and pre-admission notification for HMO's.

26

<u>C. Categories of Health Plans Offered by</u>
<u>Humana to Class Members</u>

39.     Humana operates the following types of HMOs: (a) a classic staff model, in which the

health plan corporation employs physicians and other health care professionals on a regular or

capitated basis; (b) a staff-network model, in which staff physicians are supplemented by

physicians who contract with the health plan to be in its network of participating physicians and

are paid negotiated fees; and (c) a mixed model.  Under the "capitation"system, each physician

or group of physicians receives a fixed monthly payment per subscriber  regardless of the

amount of medical care that is provided to the subscriber or the subscriber requires.  That is,

under capitation, physicians do not receive a fee for each service actually rendered.  Instead,

monthly payments to physicians remain constant and must be used by the physicians to cover the

cost of the physician time and all medical costs associated with the care provided by the

physician -- sometimes including hospitalization, specialists and diagnostic testing.

40.     Humana's Individual HMO Plan is a medically underwritten plan that provides broad

coverage for individuals who are under age 65 and not eligible for Medicare or covered by a

commercial group plan.  Humana also sells indemnity insurance.

41.     All Humana HMOs provide a broad range of health services to Members.  In order to

obtain covered medical services, Members must choose a primary care physician from the Plan's

provider directory.  The primary care physician provides, or arranges for other doctors to

provide, all health care services for the member.

42.     Humana PPO plans are networks of providers that contract with Humana to provide

services to Members.  Humana contracts with large networks of PPO physicians, hospitals and

other health care professionals from whom Members may seek services. Each PPO plan offers two levels of coverage, including one for services from non-participating providers. While network physicians are most commonly paid negotiated fees, increasingly such network physicians have "capitation" arrangements with Humana.

43.     Humana is also in the business of underwriting, administering and operating employee welfare plans defined in 29 U.S.C. § 1002(1) as "any plan, fund, or programs which was heretofore or is hereafter established or maintained by an employer or by an employee organizations....for the purpose of providing for its participants or her beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits...."

44.     A person can join a Humana Health Plan by submitting an application and enrollment form to the plan.  Plan Membership dues are paid on a periodic basis, and plan Members have the option to renew her Membership on an annual basis.

45.     At all relevant times, Class Members purchased Health Policies with cash payments, salary deductions and/or with her labor either directly or as quid pro quo for her employers to purchase on her behalf from Humana the coverage provided by such policies.

<u>D. Disclosures by Humana to Class Members</u>

46.     From time to time, Humana provided Class Members with descriptions or certifications of the benefits provided by her Humana Health Policies.  During the Class and Sub-Class periods, Humana has on multiple occasions delivered or caused to be delivered to Class Members, Disclosure Documents including: i)  summary plan descriptions;  (ii) certificates of coverage; and (iii) other plan descriptions that Humana mailed, or caused to be mailed, to each

28

member of the Class after each Class member became a participant in a Humana Health Plan, (iv) notifications of modifications and changes to the plan, and (v) penta-annual updated summary plan descriptions that Humana mailed or caused to be mailed to Class Members and that integrated all plan amendments made within such five-year period. documents containing material omissions and misrepresentations concerning the eligibility for payment of claims by Class Members, the amount. quality and circumstances of care and services actually offered by Humana Health Plans.

47.    The Health Policies Humana sold to Class Members during the Class Period were standard in all respects relevant to Plaintiff' claims and the claims of the Class; all contained the Humana Medical Necessity Definition set forth in paragraph 22 above.  According to the Disclosure Documents, Humana Health Plans insure specified health services if, and only if, Humana determines that they satisfy  the medical necessity criteria set forth in paragraph 22.

E. Humana's Material Omissions<br>and Misrepresentations to the Class

48.    As noted, Humana represented to the Class in the Disclosure Documents that treatment and coverage decisions under Humana Health Plans will be based on the Medical Necessity Definition.  These representations were false, however: The Disclosure Documents failed to disclose that Humana and those to whom Humana delegated responsibility for administering its Health Plans made treatment and coverage decisions both on the basis of  restrictive cost-based criteria, and also under the influence of cost-based  incentives, with the purpose and effect of reducing health care available to Class Members irrespective of medical necessity.  For example,

29

the Disclosure Documents contained material omissions and fraudulent misrepresentations in the following respects:

(a)     The Disclosure Documents failed to disclose that in addition to, or in place of, the medical necessity criteria, Humana uses Undisclosed Cost-Based Criteria to approve or deny benefit claims by Class Members. These Undisclosed Cost-Based Criteria include, without limitation: (i) Interqual Criteria, (ii) Milliman & Robertson guidelines; (iii) guidelines and criteria developed and/or used by Value Health Services. While these Undisclosed Cost-Based Criteria vary in detail, they share one critical dimension: in whole or in part, they all base treatment and coverage determinations on non-medical considerations, contrary to the terms of the Medical Necessity Definition set forth in the Disclosure Documents. All Undisclosed Cost-Based Criteria therefore reduce the level of medical services available to Class Members and reduce the value of the Health Plans for which Class Members paid.

(b)     The Disclosure Documents failed to disclose that Humana provides direct cash bonuses and other financial incentives to claims reviewers who deny claims for service or limit hospital admissions even if those claims or hospital admissions otherwise satisfied the medical necessity criteria. The bonuses and financial incentives provided by Humana included, among other things, a "Utilization Incentive Plan" that provided for direct bonus payments and other benefits to

30

claim reviewers who denied a certain percentage or absolute number of submitted claims from Class Members.

(3)     The Disclosure Documents failed to disclose that Humana subcontracts to third parties, such as Value Health Services (VHS), responsibility and authority to review claims and manage benefits, for certain medical conditions and medical procedures. In determining payment eligibility for claims submitted by Members of the Class, these third-parties use criteria different from and more restrictive than, the Humana medical necessity criteria.

(4)     The Disclosure Documents failed to disclose that in determining payment eligibility for claims submitted by Class Members, Humana, as well as third parties with which Humana subcontracted, used both physicians and nonphysicians who lacked the training and specialization necessary to determine whether particular benefits should be provided in accordance with the Humana Medical Necessity Definition furnished to Class Members in the Disclosure Documents.

(5)     The Disclosure Documents failed to disclose that Humana provides direct financial incentives to treating physicians and other health care professionals to deny coverage to individuals enrolled in Humana's Health Plans, even where the proposed treatment satisfies the Humana medical necessity criteria disclosed in Humana's Summary Plans. Among other things, Humana enters into risk-sharing arrangements with physicians, including without limitation so-called "capitated

31

payment" arrangements, that provide financial incentives to treating physicians for not prescribing or recommending treatment for Class Members. In addition, Humana contracts to use VHS's Practice Review System to analyze the clinical practice patterns of individual physicians, physician networks and health care plans in order to identify both "cost effective" physicians and physicians who utilize more than the optimal amount of health services. Network physicians are notified by Humana of undesirable practice profiles (that is, health service utilization rates) and are reminded that Humana contracts only with practitioners who provide "appropriate utilization". These notifications pressure network physicians to restrict care and satisfy criteria other than those contained in the Humana Medical Necessity Definition. Taken together, these various incentives, including without limitation the "capitated payments," restrict hospitalization, limit referrals to specialists and minimize diagnostic testing for Class Members without regard to the medical necessity criteria, and, generally, lower the level of health care available to Subscribers under her Humana Health Plans. Humana knowingly and intentionally omitted to disclose the nature, extent, and significance of these financial incentives to treating physicians and other health care professionals in order to hide the nature, extent and significance of such incentives from Class Members.

(6)    The purpose and effect of the fraudulent, material omissions and fraudulent representations identified in this paragraph is to reduce the quantity of

medical services available to Class Members, to reduce the value of the Health

Plans for which Class Members paid, and thereby to benefit Humana.

(7)         Humana knowingly and intentionally failed to disclose to Class Members

all the material omissions and fraudulent representations identified in this

paragraph, with the intent to hide her use and influence from Class Members.

### F. Humana takes actions that are inconsistent
### with the interests of the Class

49.    Managed health care need not be provided in a manner that creates conflicts of interest

such as those created here. In violation of its duties under ERISA and other legal and fiduciary

obligations, however, Humana took purposeful actions to create conflicts between Humana and

Class Members as beneficiaries. Among other things:

(a)    Humana directly and/or indirectly employed doctors, nurses and other persons

("claims reviewers") to review benefit claims submitted by Members of the Class

and *gave express financial incentives to such claim reviewers to deny such claims*

*or limit hospital admissions even if those claims or hospital admissions otherwise*

*satisfied the Humana Medical Necessity Definition included in the Plan*

*Summaries distributed to Members of the Class.* These financial incentives

included, among other things, a Utilization Incentive Plan that provided for direct

bonus/payments and other benefits to claims reviewers who denied a certain

percentage or absolute number of submitted claims from Class Members.

(b)    Humana retained outside management consultants, including without limitation

Coopers & Lybrand, to make recommendations that Humana then implemented,

33

relating to the management of Health Benefit Plans, including without limitation procedures used by Humana to determine payment eligibility for claims submitted by the Class, to review denied claims, and to determine the scope of covered benefits. In engaging these management consultants, Humana principally sought to achieve financial benefits for Humana and its shareholders by, among other things, lowering the rates of utilization of services by Members of Class without regard to medical necessity, thereby reducing the value of the Health Plans to Subscribers.   Thus, in violation of ERISA and its other legal and fiduciary obligations, Humana adopted the recommendations of outside managers and consultants to promote the interests of shareholders and Humana executives at the expense of Class Members, without regard to the interest of the Class in Humana's provision of medically necessary services by Humana.

(1)1   Humana concealed from Class Members that it made "capitation payments" to the primary physicians responsible for identifying and recommending treatment options and supervising Class Members' health and medical care.  Humana made these capitation payments with the intention of inducing such primary physicians to breach her fiduciary duties to members of the Class.

(2)     Humana based treatment and coverage decisions on guidelines developed by third parties intended to reduce the level of care available to Class Members. By way of example only, Humana, for the express purpose of reducing patient care utilization rates without regard to medical necessity, used guidelines

34

purchased by Humana from Milliman & Robertson. The Milliman & Robertson guidelines employ criteria that are different from and more restrictive than the medical necessity criteria set forth in Disclosure Documents.

(3)    In connection with the management of Health Benefit Plans and the process for determining payment eligibility for claims submitted by the Class, Humana contracted with third parties, including by way of example only, Value Health Services for the purpose of developing and using medical administration software to screen claims submitted by Members of the Class. Humana contracted with Value Health Services for the purpose of reducing patient care utilization rates, in order to benefit Humana, and not for the primary purpose of protecting or promoting the interests of the participants and beneficiaries. By using the services of Value Health Services, Humana created a conflict between the interests of Humana and the interests of Members of the Class.

(4)    Humana directly and/or indirectly employed doctors as "hospitalists" to make treatment as well as coverage decisions for Class Members when they were admitted for inpatient hospital services. Humana created express financial incentives to those doctors to shorten hospital stays, including specified dollar payments for each day earlier than the norm that a patient was discharged or the level of whose inpatient care was downgraded. *These incentives were provided irrespective whether the discharge or downgrade was consistent with the patient's medical necessity.*

35

### G. Humana operates its network to implement
### and promote its wrongful scheme

50.    Humana purposefully created a centralized structure – the National Enterprise –  to carry

out its fraudulent scheme of misleading statements and material omissions in disclosures to

Class Members.  Through the National Enterprise, Humana knowingly and intentionally:

> (1)1    maintained centralized control over the content of the summary plan
>
> descriptions, certificates of coverage, other plan descriptions, notifications
>
> of modifications and changes to plans, that were distributed to Class
>
> Members;
>
> (1)2    maintained centralized control over, and deceived Class Members with
>
> respect to, the existence and use of Undisclosed Cost-Based Criteria;
>
> (1)3    maintained control, implemented, and deceived Class Members with
>
> respect to Undisclosed Cash Bonuses, including without limitation, the
>
> Utilization Incentive Plan that provided for direct bonus payments and
>
> other benefits to claim reviewers who denied a certain percentage or
>
> absolute number of submitted claims from Class Members;
>
> (1)4    maintained centralized control over, arranged for, and deceived Class
>
> Members with respect to subcontracts to third parties, such as Value
>
> Health Services, for the review of claims and the management of
>
> providing benefits for certain medical conditions and medical procedures;

36

(1)5    maintained centralized control over, and deceived Class Members with respect to direct financial incentives to treating physicians and other health care professionals to deny coverage to individuals enrolled in Humana's Benefit Plans, even where the treatment would satisfy the Medical Necessity Definition disclosed by Humana.

51.    Humana purposefully created a centralized structure to carry out its fraudulent scheme of misleading statements and material omissions in disclosures to Members of the Class of the operations of the State and Local Enterprises.  By making these material omissions and misrepresentations, Humana was able to operate the National Enterprise with sufficient participants to preserve the State and Local Enterprises, whose ability to pay dividends to the parent company, Humana, often required state or local regulatory approval.

(4)2    Humana maintained centralized control over the content of the summary plan descriptions, certificates of coverage, other plan descriptions, notifications of modifications and changes to plans, and updated summary plan descriptions that were distributed to Class Members, and Humana knowingly and purposefully conducted the affairs of the State and Local Enterprises through the material omissions and misrepresentation in these documents.

(4)3    Humana also conducted the affairs of the State and Local Enterprises by maintaining control over, and precluding disclosure to Class Members of the Undisclosed Cost-Based Criteria  used to determine whether to

approve or deny benefit claims by Class Members, including without limitation the Interqual Criteria, the Milliman & Robertson guidelines, and guidelines and criteria developed and/or used by Value Health Services.

(4)4    Humana also conducted the affairs of the State and Local Enterprises by maintaining control over, and precluding disclosure to Members of the Class of, the cash bonuses and other financial incentives provided to doctors, nurses and other persons involved in the process of approving or denying benefit claims by Members of the Class.   Through centralized planning and implementation, Humana developed and implemented the system of bonuses and other financial incentives, including without limitation the Utilization Incentive Plan that provided for direct bonus payments and other benefits to claim reviewers who denied a certain percentage or absolute number of submitted claims from Class Members.

(4)5    Humana also conducted the affairs of the State and Local Enterprises by maintaining control over, and precluding disclosure to Members of the Class of, subcontracts to third parties, such as Value Health Services, for the review of claims and the management of providing benefits for certain medical conditions and medical procedures.

(4)6    Humana also conducted the affairs of the State and Local Enterprises by maintaining control over, and precluding disclosure to Members of the Class of, direct financial incentives to treating physicians and other health

38

care professionals to deny coverage to individuals enrolled in Humana's Benefit Plans, even where the treatment would satisfy the Humana Medical Necessity Definition disclosed by Humana.

### H. Harm to the Class

52.     By means of this wrongful conduct, Humana intended to and did provide to the Members of the Class benefits of lesser value than the benefits represented to Class Members. Humana intended to retain, and did retain, the difference in value between the coverage described in the Summary Plans and the coverage actually provided to Members of the Class. Humana's wrongful conduct directly and proximately injured each member of the Class in an amount, to be determined at trial, equal to the difference in value between the coverage described in the Summary Plans and the coverage actually provided to Members of the Class.

53.     Under the terms of her Humana Health Plans, Class Members were entitled to a benefit consisting of coverage for services described in the Humana Medical Necessity Definition. This coverage benefit was of value to Class Members and was purchased by them, directly or indirectly, with her cash, salaries, and personal services. Class Members paid for the coverage-benefit whether or not they ever submitted claims for medical losses.

54.     As a result of the consistent application of the Criteria to claims for services submitted by Class Members, and the other conduct and practices described above, the coverage actually provided to all Class Members under her Plans was, in fact, coverage that was different from the coverage that was to be provided under the Humana Medical Necessity Definition set forth in Disclosure Documents distributed to Members of the Class. Through the consistent and

39

exclusive application of the Undisclosed Cost-Based Criteria, Undisclosed Cash Incentives and the other conduct and practices described above, Humana denied all Class Members the coverage they had purchased and that was due them under the terms of her Benefit Plans.        55.

The value of the coverage-benefit purchased by all Class Members, defined by the Humana Medical Necessity Definition and due under the terms of her Humana Health Plans, was greater than the value of the coverage-benefit actually provided by Defendant Humana. Each Class Member was thus denied and deprived of the value of the coverage-benefit defined in the Health Policies and was thereby damaged in an amount to be determined at trial, equal to the difference between the value of the coverage benefit purchased and the value of the coverage benefit actually provided.


## VIII. COUNT I

### Violation of RICO, 18 U.S.C. § 1961 et seq.
### (APPLICABLE TO ALL Class Members)

56.    Plaintiff, on behalf of herself and the Members of the Class, incorporate by reference all preceding paragraphs as if fully set forth herein:

### A. Overview of RICO Claim

57.    For the reasons stated in the preceding paragraphs and for the reasons set forth below, Defendant Humana engaged in unlawful conduct in violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., and in particular 18 U.S.C. § 1962(c) and 1962(a). Defendant Humana is the sole wrongdoer alleged herein to have violated RICO.

40

58.     Defendant Humana is liable under 18 U.S.C. § 1962(c) for conducting the affairs of an enterprise through a pattern of racketeering activity.

> (1)     Specifically, and as described in more detail above, Humana participated in the operation and management of both a national health care network, and state and local health care networks, consisting of Humana, the Humana Health Plans, primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies and home health agencies. The participants in each of the national, state and local health care networks were associated in fact for the common purposes of providing medical services to Humana subscribers and earning profits from the providing of those services.
>
> (2)     As also described in more detail above, Humana engaged in an open-ended pattern of racketeering activity involving multiple acts of mail fraud, wire fraud and other unlawful means, with the purpose and goal of fraudulently inducing the maximum number of persons to subscribe to Humana Health Plans for the benefit of Humana.

59.     Plaintiff and the Members of the Class were the victims of Humana's wrongful conduct. As set forth above, the Members of the Class were induced by a series of fraudulent statements and omissions to subscribe to health care policies offered by Humana, that were worth less than the value of the policies described by Humana in the fraudulent statement.

60.     By means of this wrongful conduct, Humana intended to and did provide to the Members of the Class benefits of lesser value than the benefits represented to Class Members. Humana

41

intended to retain, and did retain, the difference in value between the coverage described in the Summary Plans and the coverage actually provided to Members of the Class. Humana's wrongful conduct directly and proximately injured each member of the Class in an amount, to be determined at trial, equal to the difference in value between the coverage described in the Summary Plans and the coverage actually provided to Members of the Class.

<u>B. Pattern of Racketeering Activity</u>

61.    Defendant Humana has engaged in an open-ended pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5), involving multiple predicate acts of mail fraud (18 U.S.C. §§ 1341 and 1342) and wire fraud (18 U.S.C. § 1943), with the purpose and goal of fraudulently inducing persons to become subscribers to Humana Plans, thereby permitting Humana to unjustly enrich itself by providing less care and services than offered to induce subscribers to join the Plans.

>    (1)    Since August 1995, Humana has repeatedly delivered or caused to be delivered to Class Members, by means of the United States Postal Service, documents containing material misrepresentations and omissions concerning its determination of coverage of claims submitted by Class Members and the amount, quality and circumstances of care and services actually offered by Humana Health Plans.

>    (2)    As alleged above, these documents include (i) the summary plan descriptions, (ii) the certificates of coverage, and (iii) other plan descriptions that Humana mailed, or caused to be mailed, to each member of the Class after each

42

Class member became a participant in a Humana Health Plan. The documents also include (iv) the notifications that Humana mailed or caused to be mailed to Members of the Class setting forth modifications and changes to the plan, as well as (v) the penta-annual updated summary plan descriptions that Humana mailed or caused to be mailed to Members of the class and that integrated all plan amendments made within such five-year period.

(3)    As set forth in detail above, Humana knowingly and intentionally failed to disclose in the above-referenced Disclosure Documents that, among other things:

(i)    There exist Undisclosed Cost-Based Criteria, based on factors different from those described in the Humana Medical Necessity Definition, that Humana uses to determine whether to approve or deny benefit claims by Members of the Class;

(ii)    Humana provides cash bonuses and other financial incentives to doctors, nurses and other persons involved in the process of approving or denying benefit claims by Members of the Class, and those bonuses and other incentives are designed to cause a decrease or stabilization in utilization rates even for benefits that would otherwise satisfy the Humana Medical Necessity Definition disclosed in the Humana Summary Plans furnished to Members of the Class.

(iii)    Humana subcontracts to third parties, such as Value Health Services, the review of claims, and the management of providing benefits for certain medical conditions and medical procedures.

(iv)    In determining payment eligibility for claims submitted by Members of the Class, Humana, as well as third parties with which Humana subcontracted, used both physicians and nonphysicians who lacked the medical training and specialization to determine whether particular benefits should be provided in accordance with the Humana Medical Necessity Definition furnished to Class Members in the Disclosure Documents.

(v)    Humana provides direct financial incentives to treating physicians and other health care professionals to deny coverage to individuals enrolled in Humana's Benefit Plans, even where the treatment satisfies the Humana Medical Necessity Definition disclosed in Humana's Summary Plans.

(3)1    Humana's representation in various Disclosure Documents that treatment and coverage determinations would be based on the medical necessity criteria was therefore false, inaccurate and misleading. Humana used additional, more restrictive undisclosed criteria to make coverage and treatment decisions, with the purpose and consequence of refusing to cover medically necessary services.

62.    Defendant maintained a continuing pattern of racketeering activities within the meaning of 18 U.S.C. §1961(5), described above, consisting of knowingly misrepresenting and selling

44

medical services under Health Policies provided to Class Members and secretly administering

such Health Plans with intent to defraud Plaintiff Class Members, all in violation of 18 U.S.C. §§

1341 - 44 [and other provisions to be detailed], over a number of years during the Class Period.

Humana's wrongful acts all had the same pattern and similar purpose of defrauding Class

Members for the benefit of Humana. Each such act of racketeering activity was related, had

similar purposes, involved the same or similar participants and methods of commission, and had

similar results impacting upon similar victims, including Plaintiff and the Class. Such activities

are part of Defendant's ongoing way of doing business and constitute a continuing threat to the

property of Plaintiff Class.

## C. The Enterprise

### (1) The National Enterprise

63.     As described in detail in paragraphs above, at all relevant times, there existed a national

health care network, assembled by defendant Humana and consisting of Humana, the Humana

Health Plans, primary doctors, medical specialists, medical laboratories, hospitals, outpatient

centers, pharmacies and home health agencies, all associated in fact as part of the health care

network with common purposes of providing medical services to Humana subscribers and

earning profits from the providing of those services.

64.     The National Enterprise is an association-in-fact operating for the common purposes of:

(1) providing medical services to Humana subscribers; and (2) earning profits from the providing

of those services. The National Enterprise is centrally operated from Humana's national

headquarters in Louisville, Kentucky. The features of the structure and operation of the National Enterprise are described in detail at paragraphs 34 -36 above.

65.    In violation of 18 U.S.C. §1962(c), Defendant, during the Class Period, conducted and participated in the conduct of the affairs of the National Enterprise through the ongoing pattern of racketeering activity described in paragraphs 34 -36 above. Defendant promoted, sold and implemented the Humana Health Policies through mail and wire fraud and the other illegal conduct described above, with the purpose of maximizing the profits to be earned from premium and other payments made by Class Members, directly or indirectly, to Humana.

66.    Humana purposefully created a centralized structure to carry out its fraudulent scheme of misleading statements and material omissions in disclosures to Members of the Class through the operations of the National Enterprise. By making these material omissions and misrepresentations, Humana was able to operate the National Enterprise with sufficient participants to preserve the Enterprise's solvency. See paragraphs 34 -36 above.

 2) The State and Local Enterprises

67.    As detailed in paragraphs 37 - 38 above, at all relevant times, in each state where Humana Health Plans operate, there existed one or more state and/or local health care networks, assembled by Humana, and consisting of Humana, the state and/or local Humana Health Plan(s), primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies and home health agencies.

68.    Each State and Local Enterprise is an association-in-fact operating for the common purposes of (1) providing medical services to Humana subscribers; and (2) earning profits from

the providing of those services. Each State and Local Enterprise is centrally operated from Humana's national headquarters in Louisville, Kentucky. The features of the structure and operation of the State and Local Enterprises are described in detail above at paragraphs 37 - 38.

69.    In violation of 18 U.S.C. §1962(c), Defendant, during the Class Period, conducted and participated in the conduct of the affairs of the State and Local Enterprises through the ongoing pattern of racketeering activity described in paragraphs 37 -38 above.   Defendant promoted, sold and implemented the Humana Health Policies through mail and wire fraud and other illegal conduct described above, with the purpose of maximizing the profits to be earned from premium and other payments made by Class Members, directly or indirectly, to Humana.

70.    Humana purposefully created a centralized structure to carry out its fraudulent scheme of misleading statements and material omissions in disclosures to Members of the Class of the operations of the State and Local Enterprises.   By making these material omissions and misrepresentations, Humana was able to operate the National Enterprise with sufficient participants to preserve the solvency of the State and Local Enterprises, whose ability to pay dividends to the parent company, Humana, often required state or local regulatory approval.

71.    As set forth in paragraphs 37 and 38 above, Defendant Humana is one of the entities comprising the National Enterprise and the State and Local Enterprises, but Defendant Humana is different from the National Enterprise and the State and Local Enterprises. As set forth above, Defendant Humana is the perpetrator of the pattern of racketeering activity through which it conducted and participated in the conduct of the affairs of the National Enterprise and of the State and Local Enterprises.

47

D. Relationship between the Pattern of<br>Racketeering Activity and the Enterprise

72.    The pattern of racketeering activity alleged herein and the enterprise alleged herein are

separate from each other.  Humana engaged in the pattern of racketeering activity alleged herein

for the purpose of conducting the affairs of the alleged enterprise,  a national health care

network, and state and local health care networks, consisting of Humana, the Humana Health

Plans, primary doctors, medical specialists, medical laboratories, hospitals, outpatient centers,

pharmacies and home health agencies.

73.    The participants in each of the national, state and local health care networks were

associated in fact for the common purposes of providing medical services to Humana subscribers

and earning profits from the providing of those services.

E.  Reliance of the Class

74.    As Human know they would, Class Members reasonably relied on the accuracy,

completeness and integrity of Humana's disclosures, with the result that they purchased and

continue to enroll in Human health plans.  Had Plaintiff and Class Members known of existence

of Undisclosed Cost-Based Criteria, Undisclosed Denial Incentives, use of third party

contractors to perform claims review, incentives to physicians and others to deny claims, and the

other practices and incentives designed to reduce Subscriber coverage without regard to medical

necessity, they would have taken corrective measures, including but not limited to withdrawing

from her Human Health Plans and requesting that her employer provide another Health Plan or

options Health Plan options other than Humana.

48

## E. Benefits of Racketeering Activity

75.     Defendant Humana benefitted from its pattern of wrongful conduct by using the proceeds of that conduct to earn profits, to maintain control over the National Enterprise and the State and Local Enterprises, and to sustain the solvency of the National Enterprise, the State and Local Enterprises, and of Humana itself.  Through its pattern of racketeering activity, Humana was able to cause Members of the Class to pay, directly or indirectly, periodic fees for medical coverage.  As a result of this wrongful conduct, Humana was unjustly able to retain the difference between the value of the coverage promised to the Class in Health Policies purchased by the Class Members and the value of the coverage actually provided to Class Members, in an amount to be determined at trial.

## F. Effects on Interstate Commerce

76.     Each of the Plaintiff and Class Members, and the Defendant Humana, are "persons" within the meaning of 18 U.S.C. § 1963.

77.     Defendant Humana operates a national interstate health network, with 95% of Humana's Membership in 15 states – Alabama, Arizona, Arkansas, Florida, Georgia, Illinois, Indiana, Kentucky, Mississippi, Ohio, South Carolina, Tennessee, Texas, Wisconsin and Wyoming – and Puerto Rico.  Humana offers health plans and other employee benefit products in at least 38 states, including (in addition to the 15 states listed above) Alaska, California, Nevada, Idaho, North Dakota, South Dakota, Colorado, Nebraska, Missouri, Oklahoma, Louisiana, Iowa, New Jersey, Utah, Maryland, Virginia, West Virginia, North Carolina, Michigan, New Mexico, Hawaii, and Kansas.   Since 1983, Humana, through a network of providers, has offered health

49

care services to approximately 6.2 million Members annually. Humana contracts with more than 9,200 primary care physicians and specialists and 73 hospitals to provide health care through its HMOs and PPOs.

78.     The practices alleged herein involve the conduct of, and affect, interstate commerce, and involve assets and revenues in excess of hundreds of millions of dollars annually, in an amount to be determined at trial. The pattern of racketeering activity alleged herein is within the flow of, and substantially affects, interstate commerce.

G. Direct Injury and Damages

79.     Plaintiff and Class Members paid periodic fees, directly or indirectly, to Defendant Humana as a direct and proximate result of Defendant's fraudulent practices involving the United States mails and interstate wires, including Defendant's fraudulent misrepresentations and omissions described above. As a result of the practices described above, Humana unjustly retained the difference between the value of the coverage promised to the Class in Health Policies and purchased by Class Members, and the value of the coverage actually provided to Class Members. These damages are of an amount to be determined at trial.

80.     As a direct and proximate result of Defendant's violations of 18 U.S.C. §1962(c), Plaintiff and the Class have been injured in her business or property. The business and property of the Plaintiff Class was directly and proximately injured as a result of Defendant's racketeering activities, as described above, in that but for Defendant's fraudulent conduct, racketeering activities and knowing misrepresentation of the coverage actually provided by Health Policies, Plaintiff Class Members would not have paid as much for her Health Policies as, in fact, they

50

paid in cash, salary deductions and labor.  Pursuant to 18 U.S.C. §1964(c), Plaintiff are entitled to bring this action on behalf of the Class, and Plaintiff and the Class are entitled to recover herein actual and treble damages, the costs of bringing this suit and attorneys' fees.

81.     Defendant's use or investment of racketeering income or the proceeds thereof to acquire interests in or to operate the aforementioned enterprises injured Plaintiff Class Members in her business and property in that the Defendant operated the aforementioned enterprises for the purpose and with the effect of: (a) promoting, selling and implementing Class Members' Health Policies under the false representation that the coverage of medically necessary treatment described in the Health Policies was the same as the coverage of medically necessary treatment actually provided through use of the Criteria, and (b) inducing Class Members to pay more than the fair market value for the insurance coverage actually  provided under her  policies as administered by Defendant.

82.     The property of which Plaintiff Class Members were deprived by Defendant's fraudulent and deceptive practices consists of the difference between the value paid, directly and indirectly, by Class Members in cash, salary deductions and labor for the Health Policy as represented by Defendant and the fair market value of the coverage Plaintiff actually were provided by under the Health Policies as administered by Defendant, in an amount to be determined at trial.

51

## IX. COUNT II

Breach of Disclosure
Obligations Under ERISA
(APPLICABLE TO Members OF THE SUB-CLASS)

83.    Plaintiff incorporate by reference all preceding paragraphs as if fully set forth herein and

further allege:

84.    ERISA requires that each participant covered by an employee benefit plan be furnished a

summary plan description written in a manner calculated to be understood by the average plan

participant, sufficiently accurate and comprehensive to reasonably apprize participants of her

rights and obligations under the plan and containing, among other things, information regarding:

whether a health insurance issuer is responsible for the financing or administration of the plan;

the plan's requirements respecting eligibility for participation and benefits; and circumstances

which may result in disqualification, ineligibility or denial or loss of benefits.  ERISA, §§

102(a)(1) and (b), 104, 29 U.S.C. §§ 1021, 1022, 1024(b).  In addition, section 104(b) as

amended requires that a summary description of any reductions in covered services must be

provided to participants and beneficiaries within 60 days after the changes are adopted.

85.    As an ERISA fiduciary managing and controlling the Health Benefit Plans of Plaintiff

and the Sub-Class, acting under the authority vested in it by plan sponsors, Humana  failed to

satisfy the requirements of ERISA 29 U.S.C. §§ 1022-24 because Humana failed to disclose, in

summary plan descriptions and certificates of coverage written and provided by Humana to

ERISA participants and beneficiaries, the Benefit Plans' requirements respecting the rights of

participants and beneficiaries under the Benefit Plans; eligibility for participation and benefits;

52

the circumstances which may result in disqualification, ineligibility or denial or loss of benefits; and the source of financing of the Benefit Plans and the identity of any organization through which benefits are provided. Because Humana failed to make these disclosures, the Members of the ERISA Sub-Class could not know exactly where they stood with respect to the Benefit Plans.

86.    By way of example only, in violation of section 102 and 104 of ERISA, 29 U.S.C.§1022 and 1024, Humana, as detailed above, failed to disclose to Members of the Sub-Class that, among other things:

> (1)1    Humana applies Undisclosed Cost-Based Criteria, using factors different from and more restrictive than those described in the Humana Medical Necessity Definition, to determine whether to approve or deny benefit claims submitted by Members of the Sub-Class;

> (1)2    Humana provides cash bonuses and other financial incentives to doctors, nurses and other persons involved in the process of approving or denying benefit claims of Members of the Sub-Class, and those bonuses and other incentives are designed to cause a decrease or stabilization in utilization rates even for benefits that would otherwise satisfy the Humana Medical Necessity Definition disclosed in the Humana Summary Plans furnished to Members of the Sub-Class.

> (1)3    Humana subcontracts to third parties, such as Value Health Services, the review of claims and the management of providing benefits for certain medical conditions and medical procedures.

53

(1)4    In determining payment eligibility for claims submitted by Class Members, Humana, as well as third parties with which Humana subcontracted, used both physicians and non-physicians who lacked the training and specialization necessary to determine whether particular benefits should be provided in accordance with the Humana Medical Necessity Definition furnished to Sub-Class Members in the Disclosure Documents.

(1)5    Humana provides direct financial incentives to treating physicians and other health care professionals to deny coverage to individuals enrolled in Humana's Benefit Plans, even where the treatment satisfies the Humana Medical Necessity Definition disclosed in Humana's Disclosure Documents.

87.    By failing to notify Plaintiff and Sub-Class Members from time to time when coverage was reduced through the application of Undisclosed Cost-Based Criteria and other means, Defendant violated section 104(b) of ERISA requiring such notification within 60 days of the effective date of such reductions.

88.    Under section 502 of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff and the Class are entitled to injunctive and other appropriate equitable relief to redress the violations set forth above of the reporting and disclosure requirements set forth section 104 of ERISA.

54

## X. COUNT II

### Breach of Fiduciary Duty Under ERISA.
### (APPLICABLE TO Members OF THE SUB-CLASS)

89.    Plaintiff incorporate by reference all preceding paragraphs as if fully set forth herein and further allege:

90.    At all relevant times, Defendant Humana was a fiduciary within the meaning of that term in ERISA §3(21)(A); 29 U.S.C. § 1003 (21)(A), exercising discretionary authority, control and responsibility over the management and administration of ERISA-governed Health Benefit Plans through which Sub-Class Members purchased her Humana coverage.  Among other things, Humana has at all relevant times exercised full express and de facto discretion and authority to: (a) determine payment eligibility for claims submitted by Members of the Sub-Class; (b) review denied claims; and (c) determine the scope of ERISA-covered benefits.

A. The Duty of Loyalty- ERISA Section 104(a)(1)

91.    By virtue of the conduct described above, Humana breached its fiduciary obligations under section 404 (a)(1) of ERISA, 29 U.S.C. §1104(a)(1), to discharge its duties with respect to the Humana Benefit Plans "solely in the interest" of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and  beneficiaries and defraying reasonable expenses of administering the plan.

92.    While managed health care need not be provided in a manner that creates a conflict of interest between an ERISA fiduciary and beneficiaries, Humana took purposeful actions, described in detail above, that created a conflict of interest between Humana, as fiduciary, and Members of the Sub-Class, as beneficiaries.

55

<u>B. Duty to Discharge Responsibilities in Accordance with</u>
<u>Plan Documents -- Section 404(a)(1)(D) of ERISA</u>

93.     By failing to use the Humana Medical Necessity Definition and appropriate criteria to

evaluate the medical necessity of Plaintiff Sub-Class's claims for medical services, Defendants

failed to carry out the terms of Sub-Class Members' Benefit Plans as implemented through

Humana Policies and the benefit descriptions provided to employees, and thereby violated the

duty to discharge responsibilities in accordance with plan documents pursuant to ERISA §

404(a)(1)(D), 29 U.S.C.§ 1104(a)(1)(D).

<u>C. Duty to Discharge Duties With Care, Skill and Prudence. - Section 404(a)(1)(B)</u>

94.     By managing, operating and administering ERISA-governed Benefit Plans insured by

Humana Health Policies, as described above, Defendants failed to exercise the care of an

ordinarily prudent person engaged in a similar activity under prevailing circumstances, all in

violation of ERISA § 404(a)(1)(B); 29 U.S.C.§1104 (a)(1)(B).

<u>D. Unjust Enrichment</u>

95.     Defendant breached its fiduciary duty by materially misleading Plaintiff and the Sub-

Class to whom the duties of loyalty and prudence were owed, reaped the benefits of that

description by receiving unearned premium revenues from the Plaintiff and the Sub-Class and

unjustly retained that enrichment.

96.     By evaluating the medical necessity of medical services in accordance with the

undisclosed and more restrictive Criteria, Defendants intended to and did provide coverage of

lesser value than that represented to and purchased by Sub-Class Members. Defendants intended

to retain and did retain the difference in value between the coverage described in Health Policies

56

promised to and purchased by the Sub-Class and the coverage actually provided to the Sub-Class. Defendant thus fraudulently implemented the Health Policies for the benefit of Defendant and not for the benefit of Sub-Class Members.

97.    As participants and beneficiaries of ERISA-governed Health Benefit Plans, Plaintiff and the Sub-Class are entitled to appropriate equitable relief under section 502(a)(3) of ERISA, 29 U.S.C. §1132(a)(3) to (a) redress the violations of section 404 of ERISA, 29 U.S.C. §1104, set forth herein, and (b) to recover the amounts by which Humana has been unjustly enriched as a result of such violations.

98.    As participants and beneficiaries of ERISA-governed Health Benefit Plans Plaintiff and the Sub-Class are entitled appropriate relief under section 502(a)(2) of ERISA, 29 U.S.C.§1132(a)(2) to redress violations of section 409 of ERISA, 29 U.S.C. §1109, to make good to such plans any losses to the plan resulting from each breach of fiduciary duty imposed by ERISA.

## COUNT III

### Failure to Provide Benefits Due Under ERISA Plans

### (APPLICABLE TO Members OF THE SUB-CLASS)

99.    Plaintiff incorporate by reference all preceding paragraphs as if fully set forth herein and further allege:

100.    Under the terms of her Benefit Plans, ERISA Sub-Class Members were entitled to a benefit consisting of coverage for Services described in the Humana Medical Necessity Definition. This coverage-benefit is distinct from individual claims for the payment for the cost

of Services incurred by Class Members. This coverage benefit was of value to ERISA Sub-Class Members and was purchased by them, directly or indirectly, with her cash, salaries, and personal services. Sub-Class Members paid for the coverage-benefit whether or not they ever submitted claims for medical losses.

101.    As a result of the consistent application of the Criteria to claims for Services submitted by Sub-Class Members, and the other conduct and practices described in detail above, the coverage actually provided all Sub-Class Members under her Plans, was coverage that was different from the coverage indicated under the Humana Medical Necessity Definition set forth in the Disclosure Documents distributed to Members of the Sub-Class. Sub-Class Members purchased an ERISA-governed benefit – coverage for medically necessary Services as described and defined in Humana Health Policies – which they were due under the terms of her Benefit Plans. Through the consistent and exclusive application of Undisclosed Cost-Based Criteria and the other conduct and practices described above, Humana denied all Sub-Class Members the coverage they had purchased and that was due under the terms of her Benefit Plans.

102.    The value of the coverage-benefit purchased by all ERISA Sub-Class Members, defined by the Humana Medical Necessity Definition and due under the terms of her Benefit Plans, was greater than the value of the coverage-benefit actually provided by Defendant Humana. Each ERISA Sub-Class Member was thus denied, and deprived of the value of, the coverage-benefit defined in the Health Policies, was thereby damaged in an amount, to be determined at trial, equal to the difference between the value of the coverage benefit purchased and the value of the coverage benefit actually provided.

58

103.    Pursuant to §502(a)(1)(B) of ERISA, 29 U.S.C. 1132(a)(1)(B), Members of the Sub-

Class are entitled to recover benefits due to them under the terms of her Plans and can enforce

her rights under the terms of her Plans.  The Sub-Class in this action is entitled to recovery of

past coverage-benefits in an amount, to be determined at trial, equal to the difference between

the value of the coverage-benefit purchased and the value of the coverage-benefit actually

provided.

104.    Plaintiff demands a trial by jury on behalf of herself and the Class.

Dated: January 27, 2000

MILLER, SCHWARTZ & MILLER, P.A.

By: _____

James Fox Miller, Florida Bar No. 095070
Charles Fox Miller, Florida Bar No. 0970270
Greg A. Lewen, Florida Bar No. 0047422

Post Office Box 7259
Hollywood, Florida 33081-1259
(954) 962-2000
(954) 961-2124 fax

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

SUSAN KAY SMART

**DEFENDANTS**

HUMANA, INC.

00-6140
CIV-UNGARO-BENAGES
MAGISTRATE JUDGE
BROWN

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **Broward**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

CCCV 6140 / Ungaro-Benages / Brown

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

see attached

ATTORNEYS (IF KNOWN)

(d) CIRCLE COUNTY WHERE ACTION AROSE: DADE, MONROE, (BROWARD,) PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (For Diversity Cases Only) (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**V. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | B☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | B☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | B☐ 690 Other | **B SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **A LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | B☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | A☐ 535 Death Penalty | ☒ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | B☐ 550 Civil Rights | | | |
| | | B☐ 555 Prison Condition | | | |

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

29 USC § 1001-1169
18 USC § 1961-1968    see attached for cause of action

LENGTH OF TRIAL via ___ days estimated (for both sides to try entire case)

**VII. REQUESTED IN COMPLAINT:**
☒ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

**DEMAND $**
to be determined

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See instructions)
unknown

JUDGE _____     DOCKET NUMBER _____

DATE 1/26/00

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # 518441    AMOUNT 150.00    APPLYING IFP ___    JUDGE ___    MAG. JUDGE ___

1/28/00